AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

FILED
~~RICHARD W. HAGEL~~
CLERK OF COURT

2016 JUL 11 PM 3:16

U.S. DISTRICT COURT

| In the Matter of the Search of | ) | |
| --- | --- | --- |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. **3:16 mj** 191 |
| INFORMATION ASSOCIATED WITH kcatsblue@aol.com THAT IS STORED AT PREMISES CONTROLLED BY AOL INC. | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Eastern _____ District of _____ Virginia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
| --- | --- |
| See Attachment C | |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Donald P. Moesle Jr., Special Agent, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **July 11, 2016**

City and state: Dayton, Ohio

_____
*Judge's signature*

Michael R. Merz, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with "kcatsblue@aol.com" that is stored at premises owned, maintained, controlled, or operated by AOL Inc., a company that accepts service of legal process at 22000 AOL Way, Dulles, Virginia, 20166.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by AOL Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) in June 2016, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      All records or other information stored at any time by an individual using the account, including address books/contact lists, pictures, and files;

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

II.    **Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence

and instrumentalities of violations of 18 U.S.C. § 2251(a) (production or attempted production of

child pornography); 18 U.S.C. § 2252(a)(2) (receipt or attempted receipt of child pornography);

18 U.S.C. § 2252(a)(4)(B) (possession of child pornography); and 18 U.S.C. § 2422(b) (coercion

and enticement), those violations involving Michael Kirkwood ("**KIRKWOOD**") and occurring

after January 1, 2014, including, for the account or identifier listed on Attachment A, information

pertaining to the following matters:

(a)    Any communications, visual depictions, and records related to the production,

receipt, possession, or distribution of images containing minor(s) (as defined in 18

U.S.C. § 2256(1), *i.e.*, individuals under the age of 18) engaged in sexually

explicit activity (as defined in 18 U.S.C. § 2256(2)) or involving erotica.

Information regarding the identities of the minor(s) depicted in images involving

sexually explicit activity or erotica, and the identities of persons who possessed,

distributed, or produced such images.

(b)    Any communications between **KIRKWOOD** and minors, including but not

limited to communications between **KIRKWOOD** and minors to solicit or coerce

sexual acts, obtain photographs of the minor(s), learn the age of the minor(s),

identify the location where the minor(s) lives and their family members, or to

purchase/attempt to purchase items for the minor(s) (including purchases of

lingerie or underwear).

(c) Information related to travel by **KIRKWOOD**, including but not limited to credit card receipts, itineraries/maps/driving directions, GPS information, and hotel reservations/bills.

(d) Information regarding any Internet or cellular telephone communications (including email, social media, online chat programs, and text messages) with minors (as defined in 18 U.S.C. § 2256(1), *i.e.*, individuals under the age of 18), and any contact/identifying information for these individuals.

(e) Any visual depictions and records related to the possession, receipt, and distribution child pornography or child erotica.

(f) Evidence of utilization of email accounts, other internet service providers, social media accounts, online chat programs, and Peer-to-Peer sharing programs, including any account/user names.

(g) Any photographs, videos or other visual depictions of minors, including, but not limited to child pornography as defined in 18 U.S.C. § 2256(8) and visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

(h) Information regarding access to websites or other internet platforms where child pornography is distributed.

(i) Evidence related to **KIRKWOOD's** use of fictitious names or aliases.

(j) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

3

(k) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

## ATTACHMENT C

| | |
|---|---|
| 18 U.S.C. § 2252(a)(4)(B) | possession of child pornography |
| 18 U.S.C. § 2251(a) | production or attempted production of child pornography |
| 18 U.S.C. § 2252(a)(2) | receipt or attempted receipt of child pornography |
| 18 U.S.C. § 2422(b) | coercion and enticement |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH kcatsblue@aol.com THAT IS STORED AT PREMISES CONTROLLED BY AOL INC. | 3 : 16 mj 191<br><br>Case No. _____<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, DONALD P. MOESLE, JR., being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain accounts that is stored at premises controlled by AOL Inc., a company that accepts service of legal process at 22000 AOL Way, Dulles, Virginia, 20166. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require AOL Inc. to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with Department of Homeland Security, Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), assigned to the Resident Agent in Charge in Cincinnati, Ohio, and have been a Special Agent since 2003. As part of my normal duties and responsibilities, I routinely investigate federal criminal violations relating to

child pornography and child exploitation/human trafficking in violation of 18 U.S.C. §§ 2251-2260A, 2422 and 1590-1594. I have received specific training in the areas of child pornography, child exploitation, and human trafficking. I have been in federal law enforcement since May 1996, previously serving as United States Border Patrol Agent and as an Immigration Inspector for U.S. Immigration and Naturalization Service/Customs and Border Protection. Affiant is a graduate of the ICE Special Agent Training Program and the Criminal Investigator Training Program; both of which are taught at the Federal Law Enforcement Training Center located in Glynco, Georgia. I have also attended training in computer based child exploitation from the National White Collar Crime Center and from HSI'S Cyber Crimes Center. I am a graduate of Ohio University located in Athens, Ohio where I received a Bachelor of Arts Degree in Sociology, specializing in Criminology.

3.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 2251(a) (production or attempted production of child pornography); 18 U.S.C. § 2252(a)(2) (receipt or attempted receipt of child pornography); 18 U.S.C. § 2252(a)(4)(B) (possession of child pornography); and 18 U.S.C. § 2422(b) (coercion and enticement) have been committed by Michael Kirkwood ("**KIRKWOOD**"). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6.      On or about January 26, 2016, MCSO Detective Melanie Phelps-Powers (Phelps-Powers), received a lead from the Cleveland, Ohio Internet Crimes Against Children (ICAC) Task Force that a 13 year old female (MINOR FEMALE) was receiving messages via Facebook from an adult male, later identified as **KIRKWOOD**. The complaint was made by MINOR FEMALE's father, and he alleged that the messages were inappropriate. MINOR FEMALE initially communicated with **KIRKWOOD** while at her father's residence, which is located in Kettering, Ohio, which is located within the Southern District of Ohio. **KIRKWOOD'S** Facebook account used to send the aforementioned messages is known as "mike.kirkwood.90". **KIRKWOOD** is presently 59 years old. He was born on April 1, 1957. **KIRKWOOD** is a distant relative of MINOR FEMALE.

7.      Phelps-Powers reviewed copies of the Facebook messages provided by the ICAC, which appeared to contain inappropriate sexually-related correspondence between **KIRKWOOD** and MINOR FEMALE. It appears that **KIRKWOOD** started communicating with MINOR FEMALE on or about January 17, 2016. Based on a review of the Facebook messages, it appears that **KIRKWOOD** initiated contact with MINOR FEMALE. MINOR FEMALE's father subsequently granted Phelps-Powers consent to assume the online identity of MINOR FEMALE (his minor daughter). On or about March 3, 2016, Phelps-Powers assumed

3

MINOR FEMALE's identity and began chatting with **KIRKWOOD** via Facebook messenger or texting.

8.      Your Affiant has reviewed an excerpt of the electronic messages (Facebook messages and/or texts) exchanged between **KIRKWOOD** and MINOR FEMALE and **KIRKWOOD** and Phelps-Powers (acting as MINOR FEMALE in an undercover capacity). Based on my training and experience, **KIRKWOOD** was beginning to "groom" MINOR FEMALE in order to engage in a sexual relationship with her. "Grooming" is a process that individuals (in particular sexual predators) use to incrementally gain the trust of and access to a child. As the grooming process continues, these individuals will attempt to isolate the child from friends and family and create the need to keep the relationship a secret. Based on my training and experience, the sexual predator is able to take advantage of this isolation and secrecy in order to coerce the child into a sexual relationship based upon the emotional connection that has been created. **KIRKWOOD** used Facebook to communicate with and "groom" MINOR FEMALE.

9.      Set forth below are excerpts of the initial electronic correspondence (Facebook messages) between **KIRKWOOD** and MINOR FEMALE that occurred on or about January 17, 2016 ("K" = **KIRKWOOD** and "MF" = MINOR FEMALE) (this correspondence occurred over several exchanges):

> K:      Ca [sic] you talk for a while
> MF:    Sure
> K:      Don't think anyone else should see us talking
> MF:    Ok
>
> *       *       *
>
> K:      This is just between me and you right
> MF:    Yea sure

4

         \*      \*      \*

K:     I can't believe you are 13, you look older

         \*      \*      \*

K:     Well it is always fun to be bad sometimes
MF:    Yea sometimes
K:     Fun bad
MF:    Yea I know

         \*      \*      \*

K:     Do men interest you
MF:    Not really I'm not interested in dating anyone
K:     Not talking about dating
MF:    ?
K:     You curious
MF:    Well I don't know what you mean by that
K:     Nevermind just being stupid lol
MF:    OK
K:     Just about their bodies, Did I make you mad, OK, You there

10.     On or about February 25, 2016, **KIRKWOOD** and Phelps-Powers (acting as MINOR FEMALE in an undercover capacity) exchange messages on Facebook. **KIRKWOOD** initiates the conversation and reiterates that they should keep their conversation just between them.

11.     The following are excerpts from electronic correspondence (Facebook messages) between Phelps-Powers (acting as MINOR FEMALE in an undercover capacity (referenced in the chats below as "UC") and using MINOR FEMALE's Facebook account) and **KIRKWOOD** that occurred on or about March 16, 2016 (after **KIRKWOOD** attempted to call MINOR FEMALE):

K: Don't be afraid to tell me about your body

UC: I'm not, just not much to tell

K: Tell me about it

   \*  \*  \*

K: I bet your body has changed

UC: I got taller

K: Am I imbarressing [sic] you

UC: Not really

K: You said I could ask you anything

UC: Yes

K: Bra size

UC: Just the size?

K: Yes and whatever else you want to tell me

UC: I guess medium

K: cup size

UC: B, lol

   \*  \*  \*

K: Ok would you want me to take you shopping

UC: Maybe

K: What kind of clothes

UC: Jeans, shirts

K: Is that it

UC: Idk, (Smiley face sticker), a car, lol

K: Lingerie

UC: I don't have any of that

K: Would you like some

UC: Maybe

12. On or about March 16, 2016, **KIRKWOOD** also offered via Facebook messenger to buy "MINOR FEMALE" (in actuality chatting with Phelps-Powers who was acting in an undercover capacity using MINOR FEMALE's Facebook account) "teddy" and "panties." On

that same day, **KIRKWOOD** asked via Facebook messenger whether "MINOR FEMALE" if she would model them. **KIRKWOOD** also states in one message that he works in a tool shop.

13.     On or about May 18, 2016, **KIRKWOOD** exchanged Facebook messages with Phelps-Powers (acting as MINOR FEMALE in an undercover capacity). During this exchange, **KIRKWOOD** stated that he had looked at lingerie to give to MINOR FEMALE and asked for a recent picture of MINOR FEMALE. **KIRKWOOD** also inquired whether MINOR FEMALE would be alone once school ended and whether they could spend the day together. On or about May 19, 2016, **KIRKWOOD** again attempted to call MINOR FEMALE.

14.     On or about May 25, 2016, **KIRKWOOD** and "MINOR FEMALE" (Phelps-Powers acting in an undercover capacity using MINOR FEMALE's Facebook account) exchanged messages via Facebook messenger, which is excerpted below:

> K:     Yes sounds great, Remember that you are going to be older
> UC:    So what do older girls do
> K:     Oh I can't tell you lol
> UC:    Yes you can
> K:     Oh I don't know if I can
> UC:    Why not
> K:     It's adult things
> UC:    I'm not a kid
> K:     very true
> UC:    So tell me
> K:     Sometimes they make love
> UC:    I know that, I told you I'm not a kid
>
> K:     That's what adults do sometimes, Believe me [name redacted] I know that you are not a kid
> UC:    Ok
> K:     Your more of an adult then some adults
> UC:    Thanks
> K:     I just want you to be an adult when you are with me
> UC:    I can be
> K:     Ok sounds great, you won't be scared will you

7

UC:    About being an adult around you?
K:     Yes
UC:    No, why
K:     Just asking

15.    The following are excerpts from electronic correspondence (Facebook messages)

between Phelps-Powers (acting as MINOR FEMALE in an undercover capacity and using

MINOR FEMALE's Facebook account) and **KIRKWOOD** that occurred on or about May 29,

2016:

K:     I will teach you some things
UC:    Like what
K:     Some adult things
UC:    I'm not a kid

K:     I know I said some adult things, I am going to treat you like a
       grown woman
UC:    Good
K:     But no sex
UC:    ok
K:     You don't want that anyway
UC:    Why
K:     Oh you would like it
UC:    Idk
K:     If we did it and someone would find out I would be in big trouble
UC:    I won't tell
K:     Ever?
UC:    No, Can I ask you a question
K:     Well whatever you want to do we can, sure
UC:    Will it hurt
K:     It may hurt at first, But it will so good
UC:    I don't want it to hurt

K:     Well because it is your first time it will but it will stop hurting in
       about a minute, you can ask me anything

UC:    Ok, cool
K:     Is that something that you ma y [sic] want to try
UC:    Maybe

8

K:     Ok, I can always use my fingers first
UC:    Will that hurt?
K:     No
UC:    Ok


*     *     *

K:     Would you be able to take a pic of you in panties and bra
UC:    I'll try
K:     Promise
UC:    Yes

16.     On or about June 7, 2016, **KIRKWOOD** again chatted with who he believed was MINOR FEMALE (in actuality Phelps-Powers acting as MINOR FEMALE in an undercover capacity). During the conversation, **KIRKWOOD** and Phelps-Powers agreed that he would meet MINOR FEMALE at the Dayton Mall, and **KIRKWOOD** chose Victoria's Secret as the exact meeting place. After confirming that MINOR FEMALE's mother would not know about MINOR FEMALE going to the mall, **KIRKWOOD** expressed his desire for MINOR FEMALE to "model" for him in his truck and to engage in other sexual-related activities:

K:     We can do whatever you want to
UC:    Cool
K:     What do you have in mind
UC:    You said we could make out
K:     You want to
UC:    I think so
K:     Ok we can do that
UC:    OK, cool
K:     What would you like to try
UC:    Idk
K:     Some adult things?
UC:    Yes
K:     So if we do this no one will ever know right
UC:    No way, I'll get in so much trouble
K:     I'm will be too

9

\*    \*    \*

K:     What is something we can't do

UC:    What?

K:     No its am asking you what is something you don't me to do

UC:    Idk, Can we just see how things make me feel

K:     Yes anything

UC:    U get kinda nervous but excited, Does that make sense

K:     Yes you are excited about making out but you are sill nervous

UC:    Yes

K:     Ok i understand

UC:    Good

K:     No sex

UC:    Ok

K:     I will make you feel good

UC:    OK, So I'll see you tomorrow

K:     Yes 2 oclock [sic]

UC:    Maybe a little after

K:     Sit in the chairs in front of Victoria Secrets

UC:    OK

K:     What will you be weasring

UC:    My black skirt, probably a blue shirt, what about you

K:     Jeans and a Polo shirt, underwear

UC:    Lol, me too

K:     Panties and I [sic] bra?

UC:    Yes

K:     Silk panties?

UC:    I don't have any

K:     You will tomorrow

UC:    Cool, Mom said I have to get off my ipad

K:     Ok can I keep your ones that you wear tomorrow

UC:    Idk, maybe

K:     And can you please send me your picture, I'm buying you new ones

UC:    I know

K:     Can you send me a pic

UC:    I'll try, C u tomorrow

K:     Ok go to the bathroom and take a pic and send it to me

10

UC:    I'll try, By [sic]

K:      Promise LOL, Bye sweet dreams.

17.    In summary, it was agreed that their meeting would take place at 2:00 pm the next day, June 8, 2016. Near the end of their chat, **KIRKWOOD** asked if he could keep the panties she would be wearing went they met.

18.    On June 8, 2016, prior to the scheduled meeting time of 2:00 pm, Detective Phelps-Powers, acting in an undercover capacity (passing as MINOR FEMALE), sent **KIRKWOOD** a message via Facebook stating "Almost there." **KIRKWOOD** replied via Facebook "Me Too" and said "Meet me in front of Victoria Secret." At approximately 2:00 pm, **KIRKWOOD** arrived at the Dayton Mall and entered through Entrance #2. This is the closest entrance to the Victoria's Secret store in the Dayton Mall. Shortly after entering the Dayton Mall, **KIRKWOOD** was arrested.

19.    Following his arrest, **KIRKWOOD** agreed to be interviewed by law enforcement. During the interview, **KIRKWOOD** stated, among other things, that: (1) he chatted online with MINOR FEMALE and approximately 20 other female girls around the age of 13; (2) he had not met with any of the other girls; and (3) he received and possessed child pornography on his home computer.

20.    On or about June 8 and 9, 2016, law enforcement executed a search warrant at **KIRKWOOD's** residence in Lebanon, Ohio.

21.    During the aforementioned search of **KIRKWOOD**'s residence in Lebanon, Ohio, law enforcement located and seized, among other items, three (3) desktop computers and three (3) laptop computers.

22.     On June 13, 2016, law enforcement executed a search warrant on Facebook to obtain information regarding KIRKWOOD'S Facebook account "mike.kirkwood.90".

23.     On June 17, 2016, law enforcement received Facebook's response to the aforementioned search warrant. The content in the "mike.kirkwood.90" Facebook account included photographs of **KIRKWOOD**, the above described chats with Detective Phelps-Powers, and other information confirming **KIRKWOOD**'s use of the Facebook account. The information provided by Facebook also showed that a registration email of "kcatsblue@aol.com" was used in connection with the Facebook account, indicating that KIRKWOOD uses or has used the "kcatsblue@aol.com" serviced by AOL Inc.

24.     On or about June 29, 2016, law enforcement conducted forensic previews of some of the electronic storage devices seized from the **KIRKWOOD** residence, including the aforementioned computers. The previews resulted in the discovery of multiple digital images of child pornography. The forensic preview identified the file locations for the child pornography images, which indicated that several of the digital child pornography images were associated to AOL or AOL Desktop.

25.     Based on the facts above, Affiant asserts that there is probable cause to believe that the "kcatsblue@aol.com" email account will contain evidence, contraband, or fruits of the following violations: 18 U.S.C. § 2251(a) (production or attempted production of child pornography); 18 U.S.C. § 2252(a)(2) (receipt or attempted receipt of child pornography); 18 U.S.C. § 2252(a)(4)(B) (possession of child pornography); and 18 U.S.C. § 2422(b) (coercion and enticement).

12

## BACKGROUND ON INDIVIDUALS WHO ACQUIRE AND POSSESS CHILD PORNOGRAHY

26.     Based on my training and experience as an investigator of child pornography and child exploitation offenses, I know that individuals who have a sexual interest in children commonly:

    a.  Receive sexual gratification and satisfaction from actual physical contact with children and from fantasy that may be stimulated by viewing children engaged in sexual activity or in sexually suggestive poses (in person, in photographs, in drawings or other visual media), or from literature describing such activity.

    b.  Collect sexually explicit or suggestive materials (whether of adults or children) consisting of photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media that they use for their own sexual arousal and gratification.  Further, they commonly use this type of sexually explicit material to lower the inhibitions of the children they are attempting to seduce, to arouse the victim child and to demonstrate the desired sexual acts.

    c.  Rarely dispose of the collection of sexually explicit material, especially if it is used by them in the process of seducing children.

    d.  Correspond with other persons having a sexual interest in children to share information and identities of their child victims as a means of gaining status, trust, acceptance and/or psychological support.

    e.  Prefer contact with children of a particular gender or age range.

    f.  Obtain, collect and retain photographs of the children with whom they are or have been involved. These photographs depict the children in sexually explicit activity or may depict a child engaged in offensive activity.  If the child is a particular favorite, the photograph may be carried by the suspect on his or her person (such as in a wallet).

    g.  Photos of children with whom such an individual has been involved are commonly used a means of reliving the sexual encounters with a child or fantasies of such sexual encounters. In the event that the photos depict children engaged in sexual activity, they are frequently used to blackmail the children to continue sexual activity or into keeping the molestation a secret. These photographs are extremely important to such individuals and are likely to remain in the possession of or under control of such an individual for extensive time periods, perhaps for a lifetime.

13

h.   Collect or maintain information concerning sexual activities of and with children.

i.   Use sexual aids or sexual toys such as dildos, vibrators, etc. These items are commonly used to arouse the curiosity of the selected child's sexual partner plus to sexually arouse the child and the adult.

j.   Own and operate photographic production or reproduction equipment.  Such individuals are commonly fearful that commercial photo developers may report them to law enforcement authorities and so they produce (and reproduce) their own materials.

k.   Are very concerned with the security of their collections of photographs, child pornography, erotica and other illicit materials or information about a specific victim child or sexual activity with children.

l.   Keep the names, addresses, phone numbers or other identifying information of the children with whom they have been sexually involved.

m.   Keep records of their sexual activities with children. These diaries may be kept in a formal diary book, a notebook, an audiocassette or accumulated scraps of paper or in a computer memory disk.

27.    In general, an email that is sent to an AOL Inc. subscriber is stored in the subscriber's "mail box" on AOL Inc. servers until the subscriber deletes the email.  If the subscriber does not delete the message, the message can remain on AOL Inc. servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on AOL Inc.'s servers for a certain period of time. A preservation request was sent to AOL Inc. in June, 2016.

## BACKGROUND CONCERNING EMAIL

28.    In my training and experience, I have learned that AOL Inc. provides a variety of on-line services, including electronic mail ("email") access, to the public.  AOL Inc. allows subscribers to obtain email accounts at the domain name aol.com, like the email account listed in Attachment A.  Subscribers obtain an account by registering with AOL Inc.  During the

14

registration process, AOL Inc. asks subscribers to provide basic personal information. Therefore, the computers of AOL Inc. are likely to contain stored electronic communications (including retrieved and unretrieved email for AOL Inc. subscribers) and information concerning subscribers and their use of AOL Inc. services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

29.     An AOL Inc. subscriber can also store with the provider files in addition to emails, such as address books/contact lists, pictures (other than ones attached to emails), and other files on servers maintained and/or owned by AOL Inc. In my training and experience, evidence of who was using an email account may be found in address books/contact lists, email in the account, and attachments to emails, including pictures and files.

30.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often provide clues to their identity, location or illicit activities.

31.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This

15

information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

32. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

33. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of

16

occupancy" while executing a search warrant at a residence.  For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by the email provider can show how and when the account was accessed or used.  For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email).  Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

34.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on AOL Inc. who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

DONALD P. MOESLE, JR.
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me on July 11, 2016.

HONORABLE MICHAEL R. MERZ
UNITED STATES MAGISTRATE JUDGE

18